# CHARLES DRAPER, Respondent, v. THE KANSAS CITY RAILWAYS COMPANY, Appellant.

### Kansas City Court of Appeals, May 20, 1918.

1. **Negligence: Street Cars: Unreasonable Speed.** Whether a person, injured when struck by a street car, was guilty of contributory negligence as a matter of law in failing to look again for an approaching car after he had already looked and could only see one a hundred feet away, depends on what was a reasonable rate of speed for street cars, under the circumstances, and whether he would then have had time to cross the street car track and avoid being struck had the car been running at a reasonable rate of speed.

2. ———: **Humanitarian Rule: Question for Jury.** If the motorman of a street car saw, or could have seen, a person in a confused or terrorized state standing apparently unable to decide how to get off the street car tracks, it was his duty at that time to slacken the speed or stop his car.

3. ———: **Duty of Motorman: Maintain Lookout.** It is the duty of a motorman of a street car to maintain such a lookout as will enable him to see the first appearance of danger and his employer will not be liable for failure to maintain such a lookout unless the danger appeared soon enough to use means to avert it.

Appeal from Jackson Circuit Court.—*Hon. William O. Thomas,* Judge.

REVERSED AND REMANDED.

*Clyde Taylor* and *Charles A. Stratton* for appellant.

*Park & Brown* for respondent.

BLAND, J.—Plaintiff recovered a verdict and judgment for damages for personal injuries and defendant has appealed. The case must be reversed and remanded as plaintiff confesses error in his instruction on the measure of damages. However as the case is to be retried, it is necessary for us to pass upon the other points raised by defendant.

Defendant's first point is that its demurrer to the evidence should have been sustained. The evidence taken in its most favorable light to plaintiff shows: that on the 13th of August, 1915, he was a passenger on a west-bound car belonging to defendant's predecessor, running along Ninth Street, a street in Kansas City, Missouri, running east and west; that when the car reached Bales Avenue in said city he alighted from the front end there-of (the car stopped on the west side of Bales Avenue); that when he alighted he looked toward the east and saw another car approaching about a block away; that he then looked toward the west but could see no further than Benton Boulevard, which was two blocks away, for the reason that the street perceptibly fell from Benton Boulevard toward the west; and that when he looked toward Benton Boulevard there was no eastbound car approaching upon the eastbound track, which ran to the south of the westbound track.

The car remained stationary about one minute to take on one or more passengers. After looking to the west plaintiff proceeded to the rear end of the car in order to pass behind it and cross the street to the south. When he reached a point on the westbound track the car from which he alighted was about ten (10) or fifteen (15) feet away from him and at this point he looked "around the car" but could only see one hundred (100) feet west along the eastbound track. At that time he saw no east-bound car. He then proceeded to the south across the eastbound track without again looking in either direction. When he reached the middle of the eastbound track he heard someone shout, "Hey." He thought the shout came from someone who had alighted from the west-bound car at the same time he had, so he turned and looked up in the direction of the retreating car and saw an eastbound car approaching him 75 to 100 feet away, proceeding at a rate of speed of thirty miles per hour. The motorman of the last-mentioned car was the person who had shouted to plaintiff. When plaintiff saw the eastbound car approaching him at such a terrific rate of speed he became confused by the impending danger. He

first thought that he would return and cross the west-
bound track but remembering that he had seen a car
approaching from the east on that track he thought he
had better not take any chances and made up his mind to
proceed onward across the eastbound track, but before
he could do so, the eastbound car was upon him. He
jumped "right straight up" just before the car struck
him.

The evidence shows that no signal of any kind was
given by the motorman of the eastbound car except the
shouting above mentioned. It also shows that the motor-
man did nothing whatever to stop or slacken the car un-
til after he struck plaintiff, and that he stopped the car
within sixty (60) or sixty-five (65)   feet after striking
him.

As before stated, the evidence shows that the dis-
tance from Bales Avenue to Benton Boulevard was two
blocks, Indiana Avenue being the street between.   The
distance from Benton Boulevard to Indiana Avenue is six
hundred and forty (640) feet from Indiana to Bales
Avenue four hundred and ninety-four (494) feet.   There
was a drop of .78 per cent. in the grade of the street to-
ward the east from Benton Boulevard to Indiana Avenue
and from Indiana Avenue to Bales Avenue of 3.03 per
cent.   The motorman testified in effect that he saw plain-
tiff two hundred and forty-seven (247) feet before he
struck him but that he did not check his speed when he
first saw him and that he did nothing toward stopping
the car until he got about thirty (30) feet from him.   As
before stated, plaintiff was on the westbound track
when he looked around the corner of the car from which
he had alighted and could see only one hundred feet
west.   From this we must assume that when the motor-
man, 247 feet west of plaintiff, saw him, plaintiff must
have been approaching the eastbound track.

The case was submitted to the jury upon two theo-
ries; the first being upon that of excessive speed, plain-
tiff pleading and proving an ordinance of Kansas City
providing that, "and all cars shall be run at all times and
places at a reasonable rate of speed under the particular

circumstances." This was the ordinance granting defendant's predecessors their franchise. The second theory upon which the case was submitted was the "humanitarian" or "last chance" doctrine.

We will take up the excessive speed theory first. Defendant contends that plaintiff: was guilty of contributory negligence as a matter of law in not looking again for east bound cars after he looked and could see only one hundred feet west. Whether or not plaintiff was guilty of contributory negligence in not again looking would depend entirely on the circumstances. In looking for eastbound cars he was only required to use ordinary care to see a car approaching and in discharging this duty he was required only to place himself in a position where he could have a view of the track for a sufficient distance to enable him to see an approaching car (if one were present) far enough away that he could, by the exercise of ordinary care, then cross over the track in safety. There is nothing in the evidence in the way of an ordinance, or otherwise, to show directly what was a reasonable rate of speed. Under such conditions this was a question for the jury. However, whether plaintiff was guilty of contributory negligence would depend entirely upon what was an unreasonable rate of speed for cars under the circumstances and whether he would have had time to cross the eastbound track before being struck by a car that was not proceeding at such a rate of speed, had one been coming one hundred feet away at the time he looked for eastbound cars. The street car tracks were notice to plaintiff of danger and he could not assume that there was no car coming without looking nor could he assume that there was no car approaching the one hundred foot point at which he looked. Therefore, if he did not have time to cross the eastbound track before a car running at less than an unreasonable rate of speed could reach him, then he was guilty of contributory negligence. If he did have time to so cross, then he was not guilty of negligence. [Schrauchon v. Met. St. Ry. Co. 232 Mo. 587.]

On the theory of the "humanitarian" or "last chance" doctrine the evidence shows that when the motorman shouted to plaintiff the car was seventy-five (75) to one hundred (100) feet away, so we may assume that it was one hundred feet away. Plaintiff testified that if at that time he had not become confused, he could have either retraced his steps and gotten off the track and avoided the injury, or he could have gone forward and escaped the injury by getting off the track. Defendant's contention, in view of these facts, is that plaintiff was not in a position of peril until the car reached this point and that the motorman was under no obligation to do anything toward averting an impending accident until this time. As we have before stated, the motorman testified that he saw plaintiff two hundred and forty-seven feet away and at that time plaintiff must have been approaching a position of danger. Whether the motorman was required to do anything before he reached the point one hundred feet distant from plaintiff, we believe there was sufficient evidence to go to the jury as to whether he could have slackened the speed or stopped the car after reaching this point and so have averted the accident. It was for the jury to say, under the facts shown in this case, whether or not plaintiff evidenced to others confusion or terror after being shouted to by the motorman and whether the motorman saw or, by the exercise of ordinary care, could have seen such a manifestation. If the motorman saw or could have seen plaintiff in a confused or terrorized state and standing apparently unable to decide how to get off the track, it was his duty at that time to have slackened the speed or stopped the car. The evidence shows that instead of doing this he did nothing whatever to avoid these things until after he struck the plaintiff, and that he stopped the car within sixty or sixty-five feet after striking him. Under these facts it was for the jury to say whether the motorman was guilty of negligence under the humanitarian doctrine. [Gordon v. Railway, 153 Mo. App. 555; Shipley v. Railway, 144 Mo. App. 7; Moore v. United Rail-

ways Company, 185 Mo. App. 184; Holzemer v. Met. St. Ry. Co., 261 Mo. 379.]

That part of plaintiff's instruction No. 2 covering the duty of the motorman to keep a vigilant watch is erroneous. The duty of the motorman was to maintain such a lookout as would enable him to see the first appearance of danger and defendant would not be liable for the failure of such motorman to maintain such a lookout unless that danger appeared soon enough to use means to avert it. This part of the instruction entirely ignores the facts that would constitute liability on the part of the defendant. While it is possibly not reversible error, we see no reason why the vigilant watch element and the theory of excessive speed should be combined in one instruction, as is done in plaintiff's instruction. No. 2. Defendant attacks plaintiff's instruction No. 4. We see no defect in this instruction except it does not require the jury to find that the motorman saw, or could have seen, plaintiff in the terrorized state. Even if plaintiff happened to get into such a state by his own negligence, if was the duty of the motorman, for humanity's sake, to use means to prevent striking plaintiff if he saw, or could hace seen, by the exercise of ordinary care, the situation. [Shipley v. Railway, supra.]

Defendant's attack on plaintiff's instruction No. 1, is not well taken.

Defendant's instruction D6 was properly refused. It told the jury that plaintiff was guilty of contributory negligence if he did not continue to look for the approach of eastbound cars. If the facts on a new trial show that plaintiff was not guilty of contributory negligence in not again looking, a question we have already covered, then he was not required as a matter of law to look again.

The judgment is reversed and the cause remanded. All concur.